AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Delaware ~~REDACTED~~

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 19-285M |
| ████████████████ | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT    SEALED

UNSEALED
10/22/20
LJF

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____Delaware_____ , there is now concealed *(identify the person or describe the property to be seized)*:

~~FILED~~

See Attachment B

OCT 22 2020

U.S. DISTRICT COURT DISTRICT OF DELAWARE

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1030(a)(2) | Obtaining Information from Protected Computer by Exceeding Authorized Access |
| 42 U.S.C. 132d-6(a)(2) | Obtaining Individually Identifiable Health Information Relating to an Individual |

The application is based on these facts:

FILED

See affidavit in support of an application for a Search Warrant.

☑ Continued on the attached sheet.

NOV 26 2019

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet. DISTRICT COURT DISTRICT OF DELAWARE

_____
*Applicant's signature*

Garret Kerley, Special Agent, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/26/19

City and state: Wilmington, Delaware

_____
*Judge's signature*

The Hon. Mary Pat Thynge, Chief U.S. Magistrate Judge
_____
*Printed name and title*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE
SEARCH OF:

No. 19- 285M

███████████████████████

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Garret Kerley, a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), Baltimore Division, Wilmington, Delaware, being duly sworn, depose and state as follows:

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence located at ██ ████████████████████████. (the "SEARCH LOCATION"), further described in Attachment A.

## TRAINING AND EXPERIENCE

2. I have been a Special Agent with the FBI since March 9, 2003. As part of my duties, I investigate violations of federal law, including Health Care Fraud, Complex Financial Crimes, and Public Corruption. I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations.

1

3.     As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I previously participated in the execution of numerous search warrants and arrest warrants and have previously prepared numerous search warrant affidavits.

4.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that contained within the SEARCH LOCATION is evidence, instrumentalities, contraband or fruits of crime, further described in Attachment B, pertaining to violations of Title 18, United States Code, § 1030(a)(2) (Obtaining Information from a Protected Computer by Exceeding Authorized Access) and Title 42, United States Code, § 132d-6(a)(2) (Obtaining Individually Identifiable Health Information Relating to an Individual).

5.     Unless otherwise stated, all information contained in this affidavit is either personally known to me through my investigation or is information that has been provided to me by the Victim Corporation. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the below offenses are presently located in the SEARCH LOCATION.

## RELEVANT CRIMINAL STATUTES

6.     Title 18, United States Code, § 1030(a)(2) ("TARGET OFFENSE 1") provides in relevant part that:

2

(a) whoever—

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

(C) information from any protected computer,

is guilty of a felony offense.

7.       A "protected computer" is defined at 18 U.S.C. § 1030(e)(2)(B) as a computer "which is used in or affecting interstate or foreign commerce or communication ...".

8.       Title 42, United States Code § 132d-6(a)(2) ("TARGET OFFENSE 2, and collectively the "TARGET OFFENSES"), states in relevant part that "(a) a person who knowingly and in violation of this part—(2) obtains individually identifiable health information relating to an individual" is guilty of a federal offense.  That section also provides that "a person (including an employee or other individual) shall be considered to have obtained ... individually identifiable health information in violation of this part if the information is maintained by a covered entity ... and the individual obtained or disclosed such information without authorization."  I am aware upon information and belief that the Victim Corporation is a "covered entity" within the meaning of 42 U.S.C. § 132d-6(a).

<u>TECHNICAL BACKGROUND</u>

9.       IP Address: An Internet Protocol address (or "IP address") is a unique numeric address used to identify computers on the Internet. The standard format for an IP address consists of four sets of numbers between 0 and 255 separated by dots, e.g., 149.101.10.40. Every computer connected to the Internet (or group of computers using the same account to access the Internet) must be assigned an IP address so that

3

Internet traffic, sent from and directed to that computer, is directed properly from its source to its destination. Internet Service Providers (ISPs) assign IP addresses to their customers' computers.  The location of IP addresses can be traced.

10.      Computer Network: interconnected computers within a limited area such as a residence, school, laboratory, university campus or office building.  A local network is a group of computers sharing the same internet connection.

11.      Computer Logs (or, as mentioned below, an "Absolute log"): A log created by a computer or computer software that provides the location of the device when it is connected to the Internet, a record of any changes to the systems operating on the computer, and/or records of any devices plugged into the computer.

12.      Geolocation: The location of a computer.  The process of identifying a computer's geolocation is accomplished through three methods: IP addresses from the computer's geographical location, Internet data from Google, Inc, when connected to a wireless internet, and location data about the laptop created by the Windows operating system.

13.      Virtual Private Network (VPN): A virtual private network (VPN) extends a private network across a public network, and enables users to send and receive data across shared or public networks as if their computing devices were directly connected to the private network. Applications running across the VPN may therefore benefit from the functionality, security, and management of the private network. VPNs may allow employees to securely access a corporate intranet while located outside the office. A VPN can also limit an employee's access to downloading or sharing specific file

4

types. A VPN is created by establishing a virtual point-to-point connection through the use of dedicated connections, virtual tunneling protocols, or traffic encryption. A VPN available from the public Internet can provide some of the benefits of a wide area network (WAN). From a user perspective, the resources available within the private network can be accessed remotely. A visual depiction of a VPN is as follows:



14.     Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

### INTRODUCTION

15.     As explained more fully below, on or about November 18, 2019, the

5

Victim Corporation, a national healthcare provider headquartered in ███████,
alerted the FBI to the potential misuse and theft of personal identifying information of
member doctors and protected patient health information by employee Weih (Steve)
CHANG.

16.     CHANG was employed by the Victim Corporation as a data analyst
working on Healthcare Effectiveness Data and Information Set ("HEDIS") information,
which is information provided to regulators regarding services provided to specific
classes of patients.  CHANG's position with the Victim Corporation was a telework
position, requiring CHANG to work from his residence at the SEARCH LOCATION.
As part of CHANG's duties, CHANG was responsible for using a laptop computer
owned by the Victim Corporation and issued to CHANG to pull HEDIS information
from the Victim Corporation's servers, located in ███████, ███████ and
transmitting relevant data to various state regulatory agencies nationwide in which
the Victim Corporation operates.

17.     In or around November 2019, the Victim Corporation realized that there
was reason to believe that CHANG had tampered with his work-issued laptop computer
in contravention of corporate policy.  After an analysis of CHANG's work-issued laptop
in or around mid-November 2019, the Victim Corporation's computer technical experts
were able to piece together logs from the laptop and other information to learn that
CHANG had inappropriately copied the personal identifying information and personal
health information of tens of thousands of member doctors and patients onto devices
owned, operated, and controlled by CHANG, in contravention of the Victim

6

Corporation's security measures.

18.       On or about November 15, 2019, CHANG admitted to at least one of the Victim Corporation's employees that he obtained the information, but refused to return the data.  CHANG also refused to allow the Victim Corporation or a neutral third party to meet with him to ensure the proper destruction of the data. At that point, the Victim Corporation alerted the FBI.

## PROBABLE CAUSE

### Background

19.       Weih Steven CHANG began working at the Victim Corporation as a Data Analyst beginning in and around November 2016.

20.       On or about August 8, 2019, corporate inventory records from the Victim Corporation reflect that Weih Steven CHANG was issued a brand new HP Elitebook 840 G6 corporate laptop bearing Asset Tag 95030 at the Victim Corporation's headquarters in ███████████ ("CHANG's work laptop").  The following screen shot from the Victim Corporation's inventory asset management application reflects the granting of CHANG's work laptop for purposes of CHANG performing his official telework duties for the Victim Corporation.

21.     Each laptop provided by the Victim Corporation to its employees contains software developed by Absolute Software Co. ("Absolute").  The Absolute software allows the Victim Corporation to monitor the location of each laptop as well as computer logs reflecting how the laptop is being used (the "Absolute logs").  The Absolute software is installed outside of the computer's hard drive and operating system so that it cannot be tampered with, by, for example, removing the computer's hard drive.  Each laptop provided by the Victim Corporation is also password protected so that only the authorized employee (in this case, CHANG) can utilize the laptop provided by the Victim Corporation.

22.     The Absolute logs for CHANG's work laptop reflect that the laptop was first utilized by CHANG outside the Victim Corporation's premises on or about August 10, 2019 at 8:45 PM.

23.     The Absolute logs also show that the laptop was accessed at that time in the proximity of ███████████████████████████ based on geolocation identification information for the laptop.  According to HR Personnel records, CHANG's registered home address with the Victim Corporation is ███████████████ ████████████ the SEARCH LOCATION.

*CHANG's Work Laptop is Modified*

24.     According to Absolute log records, on or about August 11, 2019, the user of CHANG's work laptop renamed the computer.  Technical experts from the Victim Corporation have explained to me that the computer could only be renamed if a new operating system had been installed on the computer.  Because of restrictions that the

8

Victim Corporation's information security requires on all of the corporation's laptops, a new operating system could only be installed if the original hard drive assigned to the computer was removed and a different hard drive was installed in its place.[1]

25.     Additional Absolute logs associated with the laptop confirm this is what happened.  The logs show that the computer was originally utilizing the corporate-provided Windows 10 Enterprise operating system.  However, after the name of the computer changed on or about August 11, 2019, the operating system became Windows 10 Professional, which is a slightly different operating system.  Furthermore, the computer issued to CHANG originally contained a 256gb Toshiba hard drive ("Drive 1"), but the Absolute log from on or about August 13, 2019 shows that the hard drive installed in the computer on or about August 13, 2019 changed from Drive 1 to a 128gb hard drive of unknown brand bearing serial number 0025-38B9-71B9-C8F6 ("Drive 2"). Drive 2 is an unapproved device not sanctioned by the Victim Corporation or its information security department.

26.     According to representatives from the Victim Corporation, CHANG never requested permission to remove and replace Drive 1. Such activity is a direct violation of the teleworker agreement signed by CHANG on or about November 1, 2016 and Associate Guidebook policies attested to by CHANG annually, most recently on or about October 21, 2019.[2]

---

[1] Changing the hard drive and operating system do not affect the serial number or Asset Tag of the laptop, allowing the Victim Corporation's technical experts to maintain monitoring of the location of the laptop and any changes being made to it.

[2] CHANG attested to the following relevant policies in the teleworker agreement:

27.    The log data showed that CHANG's work laptop was still in the proximity of ███████████████████████████████████████ at the time Drive 1 was removed and replaced with Drive 2.

---

"I understand and agree that I have a higher responsibility to maintain and protect the confidentiality of Company information and member information because of my teleworking status. I further agree to abide by the company's Information Security Policy. I commit specifically to keeping my computer safe, private and password protected at all times."

"I understand that my workspace should be an area that is private and without risk of breach of confidentiality. This should include three levels of security as defined by the IS Security Policy. I understand that the workspace should include lockable storage for protection of Protected Health Information (PHI) as well as other confidential company information and materials."

"I agree to take all reasonable precautions to protect Company-provided equipment and/or furniture from loss, theft, damage, or misuse. In the event of loss, theft, damage, or misuse of Company-provided equipment and/or furniture, I agree to file a police report, and immediately notify my department management and the Teleworking Coordinator."

"I understand that Company work should be performed through remote accessing the company server (via VPN, Citrix, etc.) and at no time should work be performed, save and/or stored locally to any non-Company provided computer."

CHANG also attested to the Information Security policy, including the following provision:

"Associates in possession of [corporate] laptop computers or other portable devices shall adequately protect the device from theft and/or unauthorized access.

Personal equipment is not allowed to connect to the [corporate] computing network (or be used to store company confidential, proprietary, and/or protected information and data) without prior approval from the Information Security department.

This policy outlines protocols to prevent or mitigate the risk of laptop or portable device theft and protect mobile copies of any [corporate] data from the unauthorized access, use, disclosure, modification, and/or destruction of confidential information, including PHI. All portable data storage devices must have approved encryption software installed before any [corporate] data is stored or accessed on the device. Accepted software and encryption mechanisms are available from the [Corporation's] Information Security department."

10

28.     Additional Absolute logs showed that after Drive 2 was inserted into CHANG's work laptop, the laptop continued to be geolocated in the immediate vicinity of the SEARCH LOCATION.

### *Third Hard Drive Installed into CHANG's work laptop*

29.     The logs also show that Drive 2 remained in the laptop between on or about August 13, 2019 and on or about August 28, 2019.  Beginning on or about August 28, 2019, a third hard drive, a Samsung 256gb hard drive ("Drive 3") was installed on CHANG's work laptop.  The logs show that Drive 3 remained in the laptop until on or about November 6, 2019, which was the date of the last Absolute log.  Like Drive 2, Drive 3 was also an unapproved device and there is probable cause to believe that its installation into CHANG's work laptop was a knowing violation of the Victim Corporation's policies by CHANG.

### *Installation of Portable Storage Devices into CHANG's Work Laptop*

30.     Drives 2 and 3 are hard drives capable of storing large amounts of data. Because neither hard drive is controlled by the Victim Corporation, there are no controls on these devices in place to ensure that sensitive and/or confidential data can be remotely deleted if necessary.

31.     Between on or about August 13, 2019 and on or about November 6, 2019, Absolute logs also reflect that six removable Universal Serial Bus ("USB") flash drives were installed into CHANG's work laptop.  These were similarly not approved by the Victim Corporation or its information security department.  Removable USB flash drives are portable storage devices capable of storing large amounts of data which allow the user to move significant quantities of data from one computer containing a USB

port to any other computer containing a USB port.

32.    Security protocols existing on CHANG's work laptop while Drive 1 and the original Windows 10 Enterprise operating system were installed on the laptop prevented a user from transferring any data onto an unapproved removable USB flash drive. However, after Drive 1 was removed and the operating system was changed, the Victim Corporation's security measures could no longer prevent data from being transferred onto removable USB flash drives, or any other media storage devices.

*Unauthorized and Protected Data Is Transferred to Drives 2 and 3*

33.    On or about August 13, 2019, the Absolute logs reflect that the user of CHANG's work laptop transferred a file named "HEDIS – Board Certification Rates 5 3 2019" onto Drive 2 after Drive 2 was installed into CHANG's work laptop. That file exists on the Victim Corporation's network and contains the personal identifying and qualification information for 31,971 Victim Corporation member doctors.   That information includes Social Security Numbers ("SSNs"), Dates of Birth ("DOBs"), personal addresses, National Provider Identifier ("NPI") numbers, and a number of other pieces of information about doctors practicing in at least the following states: Delaware, Michigan, Louisiana, and South Carolina.   Such information is highly protected information regulated by each state.

34.    On or about October 19, 2019, the Absolute logs reflect that the user of CHANG's work laptop then transferred the "HEDIS – Board Certification Rates 5 3 2019" file onto Drive 3 after Drive 3 was installed into CHANG's work laptop.  The logs also show that CHANG's laptop transferred four additional files: (1) "PA Health Centers Lab Data - 100"; (2) "Beacon PsychCare Claims Layout"; (3) "Supplemental

12

Data Unity EHR Data ReformatV2"; and (4) "DC Blood LEAD lab data." A review of those files on the Victim Corporation's network showed that they contained the personal health information of 4,662 patients, including SSNs, DOBs, behavioral health data and diagnoses from at least Pennsylvania, Louisiana, Florida, and the District of Columbia.

35.     The Victim Corporation's network logs reflect that CHANG's user ID, user ID "wc07377" accessed and downloaded the above-enumerated files containing highly restricted protected health information and personal identifying information on an unknown date prior to October 19, 2019. User ID "wc07377" was assigned only to CHANG by the Victim Corporation and was a password-protected User ID to ensure that no other person had access to that User ID except CHANG.

36.     Each of the aforementioned transfers of personal identifying information and personal health information onto Drives 2 and 3 occurred while unapproved storage devices were installed in CHANG's work laptop.

37.     The Absolute log immediately preceding the August 13, 2019 file transfer and immediately following it both show the geolocation of CHANG's work laptop in the immediate vicinity of the SEARCH LOCATION.   Similarly, there are five geolocation records from on or about October 19, 2019, the day that the patient personal health information was transferred. Four of those logs geolocate the laptop to the vicinity of the SEARCH LOCATION.

38.     Between on or about August 9, 2019 and on or about November 6, 2019, the Victim Corporation's Absolute log for CHANG's work laptop reported 639 entries. Out of those 639 entries, 502 entries occurred while the geolocation information

13

associated with the laptop placed it in the immediate vicinity of the SEARCH LOCATION.

### *Victim Corporation First Realizes an Issue with CHANG's Work Laptop*

39.     On or about November 4, 2019 technical experts from the Victim Corporation first realized that CHANG's computer had been modified with a new, unauthorized hard drive.

40.     On or about November 5, 2019, high ranking employees from the Victim Corporation's Human Resources and Security (including Information Security) Departments spoke with CHANG telephonically to inquire why he had modified his work laptop. CHANG stated that his work laptop was not working so he purchased a hard drive on EBay and attached it via a "Thunderbolt" (sometimes also known as a "USB-C") connection to the laptop in an effort to get it to work again. The Victim Corporation's information security personnel knew that CHANG's statement was false because the laptop does not have a Thunderbolt or USB-C connection. After that conversation, the Victim Corporation's personnel immediately disabled CHANG's access to the corporation's servers and network.

41.     On or about November 6, 2019, Victim Corporation security personnel called CHANG and instructed him to bring his work laptop and other devices (for example a keyboard and external monitor) loaned to CHANG back to the Victim Corporation's headquarters.

42.     On or about November 8, 2019, CHANG arrived at the Victim Corporation's headquarters and informed the security guard that he did not have his

14

personnel pass, but certified that he was an employee of the Victim Corporation and was trying to get into his office. As a telework employee, CHANG does not have an office in the building. The security guard alerted the Chief Security Officer ("CSO") of the Victim Corporation that CHANG was on the premises. The CSO then met CHANG at the entrance and collected the devices, including CHANG's work laptop.

### *Victim Corporation First Realizes a Data Breach Occurred*

43.    After the Victim Corporation's technical experts forensically examined the laptop on or about November 13, 2019, they realized that CHANG returned the laptop with the original Toshiba 256gb hard drive (Drive 1) installed. CHANG did not provide Drives 2 or 3. They further realized that CHANG had rendered or caused to be rendered his work laptop completely inoperable. However, the technical experts were able to review all of the log data on the laptop, which demonstrated the fact that the sensitive information had been transferred onto at least two unauthorized hard drives, Drive 2 and Drive 3. The Victim Corporation's technical experts could not determine whether that information was then further disseminated to any of the six removable USB flash drives, or any other storage devices.

### *Subsequent Interview of CHANG*

44.    A telephonic interview of CHANG occurred on or about November 15, 2019 by a Human Resources representative from the Victim Corporation, who requested that CHANG return the hard drives that the Victim Corporation knew had the sensitive information on them. CHANG admitted to having the sensitive information in his possession but said that he was not going to do anything with it. He

15

refused to come into the Victim Corporation to return the information and instead said he was resigning from his position.

45.     Another representative from the Victim Corporation called CHANG in the evening hours of on or about November 15, 2019 to attempt to negotiate a meeting at a neutral location for purposes of confirming that the sensitive information would be deleted from all storage devices possessed by CHANG.  At that point CHANG became hostile with the representative, stating that he would not agree to a meeting, and said something to the effect of "feel free to get law enforcement involved."

46.     The Victim Corporation thereafter reported the unauthorized transfer of its data to the FBI and subsequently terminated CHANG as an employee.

*FBI Surveillance of the SEARCH LOCATION*

47.     On or about November 21, 2019, I conducted surveillance of the SEARCH LOCATION.  I observed a Toyota Sienna Sports Van, bearing a Delaware license plate number ███████.  The plate is registered to a person named "Zhang WEI."  The driver's license photo for ZHANG WEI is the same driver's license photo as that of CHANG.  The driver's license number assigned to ZHANG WEI is also the same driver's license number assigned to CHANG.  Therefore, I believe that CHANG is utilizing the alias "ZHANG WEI" since the driver's license information for both individuals is the same.  The Victim Corporation has no records of CHANG utilizing any other name.

COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

16

49.   As described above and in Attachment B, this application seeks permission to search for records that might be found at the SEARCH LOCATION, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

50.   *Probable cause.* I submit that if a computer or storage medium is found at the SEARCH LOCATION, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

17

c.       Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.       Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

51.       *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SEARCH LOCATION because:

a.       Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage

medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account

19

session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

20

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to unlawfully obtain protected data, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely

21

to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

52.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of

22

information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

53.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

23

54.    Because several people may share the SEARCH LOCATION as a residence, it is possible that the SEARCH LOCATION will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

55.    I submit that this affidavit supports probable cause for a warrant to search the residence at ███████████████████████████████████████ further described in Attachment A, the SEARCH LOCATION, for evidence relating to the TARGET OFFENSES.

Respectfully submitted,

Special Agent Garret M. Kerley
Federal Bureau of Investigation

Sworn and subscribed before me this _26_ day of November, 2019

Honorable Mary Pat Thynge
Chief United States Magistrate Judge

24

## ATTACHMENT A

### DESCRIPTION OF PLACE TO BE SEARCHED

The location known as ███████████████████████████████████████s identified and described as follows:

A residential structure located at ███████████████████████ ███████ is a three story townhouse with a red brick surfacing.  There is a white garage door to the left of the black front door on the first level.  As viewed from ████████ ████████████████████████ is posted on the door.



### ATTACHMENT B
### LIST OF ITEMS TO BE SEIZED

1. All records relating to violations of Title 42, United States Code, Section 132d-6(a)(2) and, Title 18, United States Code, Section 1030(a)(2), in whatever form they exist, including electronic storage or in hardcopy format, including:

   a. Records and information relating to the personal identifying information of doctors and/or patients affiliated with the Victim Corporation, including but not limited to HEDIS data;

   b. Records and information containing patient health information;

   c. Records and information relating to the Victim Corporation;

   d. Records and information relating to accessing the Victim Corporation's computer network servers or any device connected to the Victim Corporation's computers, including the computer utilized by CHANG;

   e. Evidence of CHANG's state of mind as it relates to the crimes under investigation;

   f. Records and information relating to ownership of any devices within the SEARCH LOCATION.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

    d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of COMPUTER access, use, and events relating to crime under investigation and to the computer user;

    e.  evidence indicating the COMPUTER user's state of mind as it relates to the crime under investigation;

    f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    h.  evidence of the times the COMPUTER was used;

    i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    k.  records of or information about Internet Protocol addresses used by the COMPUTER;

    l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    m. contextual information necessary to understand the evidence described in this attachment.

3. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of

creation or storage, including any form of computer or electronic storage (such as

hard disks or other media that can store data); any handmade form (such as

writing); any mechanical form (such as printing or typing); and any photographic

form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review any information removed from ███████████████████████████ in order to locate the things particularly described in this Warrant.